GLANCY PRONGAY & MURRAY LLP
Robert V. Prongay (#270796)
Kara M. Wolke (#241521)
Alexa Mullarky (#307932)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Attorneys for Lead Plaintiff Henrik Thørring and the Proposed Plaintiff Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LANCE TULLER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TINTRI, INC., et al.,<br><br>Defendants. | Case No.: 4:17-cv-05714-YGR<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

# TABLE OF CONTENTS

I. OVERVIEW OF THE ACTION .......... 1

II. JURISDICTION AND VENUE .......... 4

III. PARTIES .......... 4

IV. RELEVANT BACKGROUND .......... 6

A. Confidential Witnesses .......... 6

B. Overview of Tintri's Product Offering .......... 6

C. Overview of Tintri's "Land-and-Expand" Sales Strategy .......... 8

D. Unbeknownst to Investors, Tintri Pressures Its Sales Team to Misrepresent Its Product Capabilities; Sales Suffer as a Result and Frustration Grows within the Sales Department .......... 9

1. Tintri Does Not Offer an "Enterprise Cloud Solution" .......... 9

2. Leading Up to the IPO, Defendants Implemented a New Marketing Scheme, Which Falsely Represented Tintri's Products as Enterprise Cloud Solutions .......... 11

3. Forced to Misrepresent Tintri's Product Offerings, Sales Slump and Sales Team Members Leave In Frustration .......... 12

E. Tintri's June 2017 IPO .......... 16

1. Defendants Boast of Supposed Enterprise Cloud Platform Success in Advance of the IPO .......... 18

2. In the Registration Statement, Defendants Unlawfully Failed to Disclose that Tintri Had Implemented a New, Misleading Marketing Scheme and the Internal Pushback Therefrom .......... 19

3. In the Registration Statement, Defendants Misrepresented that the Company Offered an "Enterprise Cloud Solution" .......... 21

4. Despite the False and Misleading Registration Statement and Prospectus, the IPO Is a Disappointment .......... 21

F. Tintri Reports Revenue at the Low End of Expectations for the Second Fiscal Quarter 2018 and Lowers Expectations for the Third Fiscal Quarter 2018 .......... 22

G. As the Stock Price Continues to Tumble, Tintri Announces Large Employee Lay-Off ..... 25

H Tintri Misses Revenue Expectations for the Third Fiscal Quarter 2018 and Defendants Announce Possible Sale of Business ..... 26

V. DISCLOSURE OBLIGATIONS UNDER THE SECURITIES ACT ..... 28

A. Section 11 Disclosure Requirements ..... 29

B. Section 12 Disclosure Requirements ..... 29

C. Disclosure Requirements Under Regulation S-K ..... 30

1. Item 303 Disclosure Requirements ..... 30

2. Item 503 Disclosure Requirements ..... 31

D. Defendants Violated Their Disclosure Obligations in the Registration Statement . 31

VI. THE REGISTRATION STATEMENT CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS AND/OR OMITTED MATERIAL INFORMATION REQUIRED TO BE STATED THEREIN ..... 32

VII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ..... 42

VIII. PLAINTIFFS' CLASS ACTION ALLEGATIONS ..... 42

IX. CAUSES OF ACTION ..... 44

X. PRAYER FOR RELIEF ..... 47

XI. DEMAND FOR TRIAL BY JURY ..... 47

Lead Plaintiff Henrik Thørring and Representative Plaintiff Rustam Mustafin (collectively, "Plaintiffs"), by and through their undersigned attorneys, individually and on behalf of all other persons similarly situated, allege the following based upon personal knowledge as to Plaintiffs' own acts, and on information and belief as to all other matters. The within allegations are based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review and analysis of: (i) Tintri Inc. ("Tintri" or the "Company")'s public filings with the Securities and Exchange Commission ("SEC"); (ii) Company press releases and presentations; (iii) public reports and news articles; (iv) research reports by securities and financial analysts; (v) economic analyses of securities movement and pricing data; (vi) transcripts of Tintri's investor calls; and (vii) other publicly available material and data defined herein. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. OVERVIEW OF THE ACTION

1. This is a federal securities class action brought on behalf of a class consisting of all persons or entities, other than Defendants and their affiliates, who purchased or otherwise acquired Tintri securities pursuant and/or traceable to the Tintri's Registration Statement and Prospectus issued in connection with the Company's Initial Public Offering ("IPO"), which commenced on June 30, 2017.

2. Tintri is a virtualized storage company that was founded in 2008, and which introduced its first product offering in March 2011. Tintri's core product offering is the VMstore, which is a storage appliance that is specialized for virtual machines ("VMs"). VMstore is designed to simplify data storage and reduce the costs of storage infrastructure and operating expenses. Tintri markets and sells its VMstore products to large public and private sector customers.

3. Tintri has historically operated within the niche market of VM-aware storage, and has competed against other legacy file storage providers and cloud-enabled storage providers. Within this niche market, Tintri was, by and large, successful, reporting 33% growth y/y and more than 1,300 customers prior to its IPO.

4. Leading into the IPO, analysts were excited about Tintri's prospects, believing its stock

to be undervalued. KeyBanc and Morgan Stanley initiated coverage at "overweight," while William Blair initiated coverage at "outperform."

5. However, unbeknownst to investors and analysts alike, management at Tintri was dissatisfied operating within such a niche market and had, leading into the IPO, implemented a new sales and marketing strategy that required its sales team to misrepresent, and indeed, to oversell, the capabilities of Tintri's product offerings.

6. Specifically, since at least 2016, Tintri's management pressured its sales team to incorporate the buzzword "cloud" into their sales presentations, although the overarching sales message at that time was still, as true, that Tintri was in fact a storage product provider. In May 2017, immediately prior to the IPO, management at Tintri abruptly changed course, and begin to require its sales force to market Tintri's product offerings as "Enterprise Cloud Solutions" in an effort to impress Wall Street and increase interest in advance of the IPO. During a sales team meeting in May 2017, Tintri's management distributed a sales deck setting forth the Company's new message – that Tintri was an "Enterprise Cloud Solutions" business.

7. Tintri's products were not, however, "Enterprise Cloud Solutions." To be an enterprise cloud solution, a product must provide processing, storage, networking, and software, and especially what is sometimes referred to as "orchestration" software. By contrast, Tintri *only* provided storage products, and to a very limited extent, software (but only software relating to storage). Thus, Tintri's products were and are most aptly and correctly described as virtualization storage products.

8. Accordingly, management's demand that sales staff misrepresent and oversell Tintri's product capabilities was met with fierce resistance from the sales force. Sales staff were embarrassed to be forced to misrepresent Tintri's product offerings to sophisticated clients who *knew* that Tintri was not actually an enterprise cloud provider. Sales team members voiced their concerns, but were categorically ignored.

9. Forced to misrepresent Tintri's product offerings, sales slumped. Simply put, Tintri's sophisticated clients were unwilling to purchase a product that was not as the Company said it was. In turn, discontent grew within the sales force whose salaries were dependent, at least in part, on commissions.

10. Discontent within the sales force led to sales team attrition and high employee turn-over. Certain employees left because they felt they could no longer work for a company that misrepresented its products in the marketplace; while others left because sales targets and goals were impossible to achieve in light of the fact that sophisticated clients were unlikely to react favorably to a false sales pitch or pay a premium price for a product that was not actually an Enterprise Cloud Solution.

11. Misrepresentation of Tintri's product offerings, as well as sales team attrition, both took a toll on the Company's "land-and-expand" sales strategy, which relies upon sales to existing customers (*i.e.*, repeat sales) to drive revenue. Not only were customers less likely to purchase Tintri's product offerings after sitting through a bogus sales pitch, but of those who did make an initial purchase, they were unlikely to make a repeat purchase when they realized that Tintri did *not* offer an "Enterprise Cloud Solution." Sales team attrition and high employee turnover also negatively impacted the sales teams' ability to develop the type of long-term, productive customer relationships that drive repeat sales.

12. It was both slow and difficult for Tintri to recover from sales team attrition and high employee turnover given that it was of paramount importance that the Company locate the *right* sales people to sell a technologically complex product, and because it took Tintri between six and nine months to train up a new sales team to reach full productivity. As discontent within the sales force brewed and sales staff left Tintri, sales and revenue were negatively impacted.

13. Despite these events that were likely to harm, and indeed were harming, Tintri in the run up to the IPO, the Registration failed to disclose that: (a) the Company had implemented a new sales strategy that required its sales force to misrepresent and oversell the capabilities of Tintri's product offerings, or (b) the sales force was pushing back against the Company's requirements, and that discontent and disorganization within the sales force was leading to sales team attrition, and ultimately, to lower sales and revenue. Further, the Registration Statement affirmatively mispresented that Tintri offered "Enterprise Cloud Solutions" when it only offered virtualization storage products and limited software programs. By these actions and omissions, Defendants have violated Sections 11, 12, and 15 of the Securities Act of 1933 (the "Securities Act").

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to §§ 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o).

15. This Court has jurisdiction over the subject matter of this action pursuant to § 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1331.

16. Venue is proper in this District pursuant to § 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1391(b) as the Company conducts business in this District and maintains its principal executive offices in this District.

17. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

18. Lead Plaintiff Henrik Thørring, as set forth in the Certification previously filed and incorporated herein by reference (Dkt. No. 29-2), acquired Tintri common stock pursuant or traceable to Tintri's Registration Statement and Prospectus issued in connection with the Company's IPO, and was damaged thereby.

19. Representative Plaintiff Rustam Mustafin, as set forth in the Certification previously filed and incorporated herein by reference (Dkt. No. 23-4), purchased Tintri securities in the IPO, pursuant to the Registration Statement and Prospectus, and was damaged thereby.

20. Defendant Tintri is a Delaware corporation with its principal executive offices in Mountain View, California. The Company's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the symbol TNTR.

21. Defendant Ken Klein ("Klein") has served as the Company's Chief Executive Officer ("CEO") and Chairman of its Board of Directors (the "Board") since October 2013. Klein signed the false and misleading Registration Statement.

22. Defendant Ian Halifax ("Halifax") has served as the Company's Chief Financial Officer ("CFO") since December 2013. Halifax signed the false and misleading Registration

Statement.

23. Defendant Kieran Harty ("Harty") founded Tintri in 2008, and has served as the Company's Chief Technology Officer ("CTO") since October 2013, and a director of Tintri since August 2008. Previously, Harty served as the CEO and Chairman of the Board from June 2008 to October 2013. Harty signed the false and misleading Registration Statement.

24. Together, Defendants Klein, Halifax, and Harty are sometimes referred to herein as the "Individual Defendants." Each of the Individual Defendants signed the false and misleading Registration Statement.

25. Collectively, Tintri and the Individual Defendants are sometimes referred to herein as the "Tintri Defendants."

26. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter in connection with the IPO.

27. Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") served as an underwriter in connection with the IPO.

28. Defendant Pacific Crest Securities, a division of KeyBanc Capital Markets Inc. ("Pacific Crest") served as an underwriter in connection with the IPO.

29. Defendant Needham & Co., LLC ("Needham") served as an underwriter in connection with the IPO.

30. Defendant Piper Jaffray & Co. ("Piper Jaffray") served as an underwriter in connection with the IPO.

31. Defendant Raymond James & Associates, Inc. ("Raymond James") served as an underwriter in connection with the IPO.

32. Defendant William Blair & Co., L.L.C. ("William Blair") served as an underwriter in connection with the IPO.

33. Each of the defendants listed in ¶¶26-32 are collectively referred to herein as the "Underwriter Defendants."

34. Collectively, Tintri, the Individual Defendants, and the Underwriter Defendants are referred to herein as "Defendants."

## IV. RELEVANT BACKGROUND

### A. Confidential Witnesses

35. Plaintiffs' allegations are supported by confidential witnesses ("CWs"), each of whom was employed by Tintri prior to the Company's June 30, 2017 IPO.

36. CW-1 was a Regional Sales Manager at Tintri from September 2014 through May 2016, in which capacity CW-1 concentrated on acquiring new contracts for Tintri in a region covering Alabama, Tennessee, and Mississippi.

37. CW-2 was a Senior Systems Engineer at Tintri from November 2015 through June 2017, for a region covering Alabama and Georgia. CW-2 accompanied the Regional Sales Managers on scheduled client meetings to address technical queries and matters that the clients wanted resolved.

38. CW-3 was a Senior Systems Engineer for Tintri's New England Region from April through December 2016, in which capacity CW-3 accompanied the Regional Sales Managers on scheduled client meetings to address technical queries and matters that the clients wanted resolved.

39. CW-4 was an Inside Sales Representative at Tintri from May to September 2017.

40. CW-5 was a Regional Sales Manager at Tintri from January 2014 to February 2017.

41. CW-6 was a Regional Sales Manager at Tintri from July 2015 through November 2017, in which capacity he managed Tintri's customers' requests in compliance with the Company's objectives and overall business plans and strategies. CW-6 also supervised the sales operations for numerous sales teams.

### B. Overview of Tintri's Product Offering

42. Tintri was founded in 2008 and introduced its first products in March 2011. Tintri offers hybrid or all-flash storage solutions for large environments of virtualized applications.

43. Tintri's core product offering is the VMstore, which is a storage appliance that is specialized for virtual machines. A virtual machine ("VM") is a software emulation of dedicated hardware, with its own operating system or application environment. Virtual machines can be run en masse on hardware, allowing end-users to reduce the costs of storage infrastructure, maintenance, power, and cooling. The process of running multiple (sometimes hundreds of thousands) of VMs at once on a single all-flash array is called virtualization.

44. Tintri's VMstore product offerings include the VMStore T5000 all-flash system, which provides all-flash capacity for the most challenging enterprise workloads; and VMStore T800 Hybrid-Flash Series, which serves typical enterprise workloads.

45. On May 17, 2016, Tintri "announced a new scale-out storage platform to enable enterprises and cloud service providers (CSPs) to *build their own* Amazon-*like* cloud infrastructure[.]" 2017/05/17 press release entitled, "Tintri Unveils Scale-out Storage Platform to Enable Enterprises and CSPs to Build Their Own Amazon-Like Cloud Infrastructure. Delivers Industry's Largest All-Flash Scale-out with Support for Up to 160,000 VMs." The "scale-out storage platform" was "VM and software based[,]" but was not itself a cloud. *See id.*

46. On November 1, 2016, Tintri announced the new release of its Tintri Operating System 4.3, which supposedly provided "expanded orchestration and automation capabilities[,]" allowing web services to run in virtual machines, and soon, containers. *See* 2016/11/01 press release entitled, "Tintri Raises the Bar for Enterprise Cloud on Web Services Architecture and RESTful APIs." This new software made Tintri's storage products compatible with cloud computing, such that Tintri could provide storage for both virtualization and cloud environments, but Tintri's product offerings did not themselves constitute an "Enterprise Cloud Solution." *See* Sec. IV.D.1, *infra*.

47. Perhaps for this reason, analysts regularly identified Tintri's competitors as legacy file storage providers, such as EMC's VNX, HP Enterprise's 3Par, and NetApp, and *cloud-enabled* storage providers, such as Nutanix and Pure Storage's FlashBlade, as opposed to actual cloud storage providers, such as Amazon and Google.

48. Overall, Tintri fills a niche market. KeyBanc explained that, "Tintri is focused on a subsegment of the storage market for virtualized x86 servers based on IP protocols (NAS and iSCSI)[.]" 2017/07/25 report entitled, "TNTR: Solving Big Problems for Large Customers; Initiating at Overweight with a $9 Price Target."

49. Accordingly, Tintri's product offerings addressed an approximate total available market ("TAM") of $7.5 billion, within the larger $37 billion storage systems and software market. *Id.*; *see also* 2017/07/25 report by Morgan Stanley entitled, "Repeat Purchases and Margin Potential Not Reflected in Valuation; Initiate OW ("Tintri provides NAS and iSCSI storage for virtualized

environments which limits TAM to $7B[;]" and "Tintri does target a niche market").

50. At the time of the IPO, Tintri had more than 1,300 customers, including 21 of the Fortune 100 companies, spanning a wide variety of industries.

**C. Overview of Tintri's "Land-and-Expand" Sales Strategy**

51. To attract customers, Tintri relies on a direct sales force using a "land-and-expand" strategy—*i.e.*, focusing on sales to existing customers—that drives the majority of the Company's total revenue.

52. Each direct sales "team consists of a quota-bearing sales rep, a sales engineer, one-half of an inside sales person, and one-tenth of a channel manager." *See* 07/25/2017 report by William Blair entitled, "Delivering a Cloud-Like Experience to Private Data Centers." Notably, "[i]t takes six to nine months for a new sales team to reach full productivity." *Id.*

53. Defendants proudly touted in the Registration Statement the success of the Company's land-and-expand strategy, stating that the Company's top 25 customers that have been customers for at least twelve months cumulatively ordered more than 19x the amount that they ordered in their first quarter as a Tintri customer. This statistic compared favorably to Tintri's competitors, Nutanix and Pure Storage, which had multiples of 18x and 12x, respectively, but which utilized more of a channel-led strategy, as opposed to a land-and-expand strategy. *See* 07/25/2017 KeyBanc report entitled, "TNTR: Solving Big Problems for Large Customers; Initiating at Overweight with a $9 Price Target."

54. Unfortunately for Tintri, however, a land-and-expand strategy can be risky, as its success depends on fantastic customer experiences to drive repeat sales – an initial sale is not the completion of the sales process. If, for example, a company misrepresents its product offering to make an initial sale—as Tintri did leading into the IPO (*see* Sec. IV.D.1-3, *infra*)—it's unlikely to make a repeat sale. Likewise, if a company has a disorganized sales force, sales team attrition, or high employee turn-over, as Tintri did prior to the IPO (*see* Sec. IV.D.3_, *infra*), it is also unlikely to be able to develop the type of long-term, productive relationships with customers that drive repeat sales.

55. Accordingly, because Tintri utilized a land-and-expand sales strategy, it was of paramount importance that it both accurately represented its product offerings and found, and retained, the *right* sales people. Indeed, Morgan Stanley identified "[s]alesforce productivity [as being] *key to*

*revenue growth*." *See* 07/25/2017 report entitled "Repeat Purchases and Margin Potential Not Reflected in Valuation; Initiate OW."

56. Similarly, a July 25, 2017 report by KeyBanc entitled, "TNTR: Solving Big Problems for Large Customers; Initiating at Overweight with a $9 Price Target," stated that:

> Tintri has a more focused customer approach than rivals because it is focused on one core product that begins to have a real performance advantage in large-scale storage environments that are only seen with the largest customers. As a result, Tintri is focused on finding the right enterprise sales reps who have ties into these types of organizations, which has led to a slower hiring ramp than other emerging storage infrastructure providers.

57. Thus, sales team attrition was a risk to the Company's revenue growth. Morgan Stanley identified "[s]alesforce disruption [a]s *the biggest risk*, including the loss of leading sales teams or underperformance of recently added teams[,]" facing Tintri. *See* 07/25/2017 report entitled "Repeat Purchases and Margin Potential Not Reflected in Valuation; Initiate OW."

58. For the reasons identified in ¶¶51-57 above, including that it takes six to nine months for a new sales team to reach full productivity, it was both difficult and slow for Tintri to fill roles due to attrition and/or disruption, and risky for the Company to misrepresent its product, or oversell its capabilities.

### D. Unbeknownst to Investors, Tintri Pressures Its Sales Team to Misrepresent Its Product Capabilities; Sales Suffer as a Result and Frustration Grows within the Sales Department

#### 1. Tintri Does Not Offer an "Enterprise Cloud Solution"

59. A "cloud" is created by using a network of remote servers hosted on the Internet to store, manage, and process data, rather than using a local server or personal computer. Cloud computing services are offered by large companies such as Amazon Web Services ("AWS"), Microsoft Azure, and Google.

60. An "enterprise cloud" refers to when a cloud infrastructure is employed within an organization's own data center (*i.e.*, private cloud) with connections to public cloud services. An "enterprise cloud platform" is a term of art that includes storage, processing, networking, and software (an orchestration layer to manage and run the cloud).

61. Different to and separate from cloud computing or enterprise cloud is virtual storage.

Virtual storage is the pooling of physical storage from multiple network storage devices into a single storage device that is managed from a central console.

62. Virtualization, which refers to the process of running multiple (sometimes hundreds of thousands) of virtual machines at once on a single all-flash array, is a technology that can be used to enable cloud computing, but it does not constitute an enterprise cloud platform – it is missing the components of processing, networking, and (sufficient) software.

63. Tintri's product offerings are virtualization storage products—*i.e.*, they *only* offer storage, and to a very limited extent, software (but only software relating to storage)—and thus, are capable of assisting customers in building enterprise cloud platforms, but cannot fairly be characterized as enterprise cloud platforms or as Enterprise Cloud Solutions.

64. CW-6, a Regional Sales Manager at Tintri from July 2015 through July 2017 confirms that Tintri's product offerings were *not* Enterprise Clouds Solutions. CW-6 confirms that, of the elements necessary to form an Enterprise Cloud Solution, Tintri *only* sold a storage product. Further differentiating its products from Enterprise Cloud Solutions, CW-6 explained that Tintri's system was created for an IP-based virtual machine (or "VM").

65. Likewise, CW-2, a Senior Systems Engineer at Tintri from November 2015 through June 2017, explained that an Enterprise Cloud Solution ("ECS") platform resides behind a firewall that delivers, among other things, software, network server infrastructure, and a storage platform; whereas, unlike an ECS package, Tintri actually offered virtualization storage, which was created for an IP based virtual machine. CW-2 also explained that Tintri's product offering required a host-computer network to be connected and used as a private virtual network, and each virtual machine and host had to be assigned addresses on the private network.

66. Additionally, CW-3, a Senior Systems Engineer at Tintri from April through December 2016, confirms the analysis of CW-6 and CW-2, that Tintri's product offering was really an IP based VM. Indeed, CW-3 stated that Tintri's products served a "narrow use case." CW-3 further stated that Tintri was really "just a piece of hardware; a virtualization storage platform[,]" and that "there is no Cloud offering."

### 2. Leading Up to the IPO, Defendants Implemented a New Marketing Scheme, Which Falsely Represented Tintri's Products as Enterprise Cloud Solutions

67. CW-3, a Senior Systems Engineer at Tintri from April through December 2016, reported that, since at least 2016, Tintri was forcing sales staff to use the buzzword "Cloud" in their sales presentations, despite the fact that Tintri was not a cloud company. CW-3 believed that when customers heard the buzzword "Cloud," they immediately thought of cloud computing services offered by large companies such as Amazon (AWS), Microsoft Azure, and Google. However, Tintri cannot fairly be characterized as an enterprise cloud company, and did not compete against these larger companies. Instead, Tintri competed against companies such as EMC's VNX, HP Enterprise's 3Par, NetApp, Nutanix, and Pure Storage's FlashBlade in the niche markets of legacy file storage providers and cloud-enabled storage providers.

68. Driven by their desire to have a successful IPO, prior to the IPO, the sales strategy at Tintri shifted from simply encouraging sales staff to use the buzzword "Cloud" to a formal *strategy requiring* sales staff to represent Tintri *as* an Enterprise Cloud Solutions provider.

69. CW-6, a Regional Sales Manager at Tintri from July 2015 through November 2017, reported that there was a sales kick-off meeting in February 2017, during which the Company still presented Tintri as a VM-aware storage company and did not (falsely) represent that Tintri offered Enterprise Cloud Solutions.

70. However, CW-6 reported that in May 2017—*i.e.*, one month prior to the IPO—Defendant Klein, together with other Tintri executives—informed the Tintri sales team that the new message, leading into the IPO, was that Tintri offered Enterprise Cloud Solutions. CW-6 reported that, as part of this effort, the sales force was presented with a new sales deck that included slides purporting to compare Tintri's product offerings with those of Amazon Web Services ("AWS"), which is a cloud provider. CW-6 believed this to be a misleading comparison. Further, the new sales deck was a mess.

71. CW-6 believed that the Company formally implemented this new, misleading sales strategy because it, and specifically Defendant Klein, were intent on going public at a high share price, and believed it was necessary to represent the Company as an ECS company to satisfy Wall Street's

expectations. Specifically, CW-6 reported that Defendant Klein wanted to achieve a higher multiple as compared to Tintri's competitor Nutanix. To do so, CW-6 reported that Defendant Klein believed Tintri had to be a cloud company, not just a storage company. CW-6 reported that Defendant Klein was "pushing to go public" and was willing to "even change the message and the direction of the company[.]"

### 3. Forced to Misrepresent Tintri's Product Offerings, Sales Slump and Sales Team Members Leave In Frustration

72. Immediately, Tintri faced pushback from its sales teams in response to the new sales deck and the Company's message that it was an Enterprise Cloud Solutions company. Indeed, CW-6 reported that the sales team universally resisted the new sales strategy. CW-6's reaction to the new directive was: "what are you doing, this is wrong."

73. Nevertheless, the Company persisted; CW-6 reported that Defendant Klein disregarded pushback from the sales department, and insisted that the Company would be promoted as an ECS company, regardless of how the sales department felt about it.

74. The sales department was unhappy because Tintri did *not* provide any Enterprise Cloud Solutions. *See* Sec. IV.D.1, *supra*. Accordingly, sales team members were unhappy, or even embarrassed, to be forced to misrepresent Tintri's products to sophisticated customers who *knew* that Tintri was not an enterprise cloud provider akin to Amazon, Google, or Microsoft. These customers were unlikely to make an initial purchase after listening to a misleading sales pitch, and if they did make a purchase, were even less likely to make a repeat purchase once they learned that the Company did not, in fact, offer ECS. Meanwhile, sales staff were still expected to meet sales targets and goals that were already difficult to achieve, and became even more so in light of the Company's new sales strategy. Further, sales staff were compensated, at least in part, by commission, and failure to make sales directly impacted their own livelihoods.

75. Expressing this discontent, CW-6 felt that Defendant Klein "lied through his teeth[,]" and made misrepresentations to the marketplace, which angered CW-6 and other sales staff. CW-6 also emphasized that not only were Tintri's product offerings not true enterprise cloud offerings, but that there was also no evidence that Tintri was even *planning* to offer true ECS products. CW-6

explained that there was no product roadmap that included the components of a true ECS, and also was no indication that Tintri was ever going to offer any so-called "hyper-converged" products. CW-6 further explained that Tintri's representation that its enterprise cloud platform was based on the Tintri CONNECT web services architecture was false because "Tintri CONNECT" is a "made-up word," and the Company's Application Programming Interfaces ("API") were only for storage.

76. CW-6 reported that sales personnel told Tom Ellery, then the Senior Vice President of World Wide Sales, that they could not justify describing Tintri as offering an Enterprise Cloud Solution. Remarkably, according to CW-6, Ellery *agreed*, saying "It's not a cloud solution." CW-6 also reported that clients' chief information officers ("CIOs") would challenge the sales teams' exploitation of the term "Cloud." CW-6 reported that CIOs regularly questioned, "where is the roadmap for the product[,]" exclaimed "show me[,]" and requested a demonstration and part number attached to the ECS product.

77. CW-6 ultimately left the Company because CW-6 was unhappy with the news sales strategy imposed by management to misleadingly market Tintri's products as Enterprise Cloud Solutions. CW-6 felt that Tintri lacked good ethical standards and did not want to be affiliated with such an organization. Tintri acknowledged that there were other losses in sales personnel, which CW-6 believed was the direct result of the Company's new, misleading sales strategy, as well as the 6:1 reverse stock split executed by Tintri, which rendered employees' stock "worthless."[1] CW-6 believed this loss of sales staff was in large part the fault of Defendants Klein and Harty due to their desire to file for an IPO before Tintri was truly ready.

78. Similarly, CW-2, a Senior Systems Engineer at Tintri from November 2015 through June 2017, believed that although Tintri's actual products were good products, they were marketed inappropriately. Confirming the allegations set forth above by CW-6, CW-2 explained that Tintri executives instructed sales staff to misleadingly promote the product as an Enterprise Cloud Solution ("ECS") package.

---

[1] CW-6 reported that discontent within the sales department grew after Tintri promised employees a 4:1 reverse stock split, but ultimately executed a 6:1 reverse stock split, which rendered employees' stock holdings "worthless" and angered employees.

79. CW-2 believed that management at Tintri made a calculated decision to advertise the Company's products contrary to their intended manufactured use. CW-2 felt uncomfortable misrepresenting Tintri's product offerings, and ultimately left Tintri because CW-2 could not work for a company that misrepresented its product in the marketplace.

80. CW-2 also reported huge departures in sales staff, which CW-2 believed were due to unrealistic sale targets and goals being placed on the sales team from executives, a situation that only could have been worsened by management's demand that sales staff both hit high numbers *and* misrepresent the product to a sophisticated client base. CW-2 reported that sales team members constantly said, "keep your head down and try to get your numbers."

81. Likewise, CW-3, a Senior Systems Engineer at Tintri from April through December 2016, explained that although Tintri had a good virtualization storage product, Tintri executives were insisting that sales teams falsely market it as an ECS package.

82. CW-3 believed it was "desperation" on the part of Tintri executives to insist that sales teams use the term "Cloud" during their sales demonstrations. CW-3 further believed that it was a calculated decision on the part of Tintri executives to over-sell the capabilities of Tintri's product offerings.

83. CW-3, also acknowledged that many sales people left the Company, and believed it was likely due to unrealistic sales targets and goals being placed on the sales team by Tintri executives, which were, presumably, even more difficult to achieve in light of the fact that sophisticated clients were unlikely to react favorably to a false sales pitch or to pay a premium price for a product that did not actually deliver enterprise cloud solutions. For example, CW-3 stated that CW-3 was given an unrealistic sales revenue target of $1.2 million to achieve in just six weeks. CW-3 believed that Dan Petrosinelli, the Senior Director of Northeast Sales at Tintri, imposed similar, unachievable mandates on other sales team members in an attempt to purge them from the unit. Overall, CW-3 stated that the sales department was a "revolving door[,]" such that personnel were continuously leaving and the turnover rate in the unit was high.

84. Not only was it difficult for sales staff to achieve sales targets and goals while misrepresenting Tintri's product capabilities, but confidential witnesses also report that the Tintri's

sales systems did not work, it was difficult to obtain approval for customer discounts, and general disorganization within the sales department negatively impacted sales.

85. For example, both CW-6 and CW-3 reported that Tintri's sales systems did not function properly. CW-6 explained that the sales systems utilized by the sales department were problematic and continuously failed or provided misinformation. This was a sentiment shared by CW-3, who explained that sales teams did not have the proper support, and that the systems used by the sales teams failed or provided misinformation. As such, CW-3 reports that sales team members were not always able to fully make use of the electronic apparatuses available to them, and were compelled to employ manual applications in order to complete their daily work. As an example of this dysfunction, CW-3 stated that when CW-3 requested basic price or quote information, it could take two days for this information to be received, and sometimes required a phone call to headquarters to extract this information.

86. Additionally, CW-6 and CW-5 both report that it was difficult to get approval for customer discounts. CW-6 reported that Tintri had refreshed a product line and was unwilling to pass on any price discounts to its customers. CW-5, a Regional Sales Manager at Tintri from January 2014 to February 2017, also explained that, leading to the IPO, it became increasingly difficult for sales people to get approval from management for discounts, inhibiting sales. CW-5 reported that management explained discounts were being denied because the Company needed to maintain a "floor" to be profitable in the IPO.

87. Similarly, numerous confidential witnesses detailed disorganization within the sales department. CW-3 reported that the sales department was disorganized and "a mess," and that "sales operations was a train wreck." CW-3 further explained that when CW-3 joined Tintri, CW-3 "walked into an empty [sales] pipeline."

88. CW-1, a Regional Sales Manager at Tintri from September 2014 through May 2016, reported that the Company was not appreciative or supportive of its sales members, and leadership did not treat sales team members with professionalism. Specifically, CW-1 stated: "they treated their sales people worse than any place I ever worked[,]" and the "sales organization was in shambles."

89. CW-4, an Inside Sales Representative from May to September 2017, also confirmed

that there was sales team attrition, stating that sales engineers and account executives were leaving Tintri prior to August 2017; while CW-5, a Regional Sales Manager at Tintri from January 2014 to February 2017, reported that there was employee discontent when, at a Company meeting, Defendant Klein unfairly blamed the lack of growth on the sales team.

90. For all these reasons, most confidential witnesses believed the IPO would be a failure from its very inception. CW-6 believed that "the company should have never gone public." CW-3 echoed these sentiments, and also believed the IPO would be a failure.

91. Ultimately, sales and revenue did not grow as anticipated because the Company forced its sales force to misrepresent and over-sell its product offerings to potential customers. As such, fewer customers opted to purchase Tintri's product offerings at all, while those who did, did not make repeat purchases, having learned that the Company did *not*, in fact, offer Enterprise Cloud Solutions. Forced to give false sales presentations, unable to achieve sales targets and goals, and earning less money from commissions, sales staff both pushed back against management and left the Company.

92. The result was disappointing financial results in both the second and third fiscal quarters of 2018[2] – the first two quarters following the IPO. Yet even then, CW-6 reported that Defendants were unable or unwilling to take responsibility. At an all-hands meeting held in or around September 2017, after the announcement of the Company's disappointing 2018 second fiscal quarter results, CW-6 reported that, following Defendant Klein's assurances that things would get better, a fellow Tintri employee stood up and asked, "why should I believe you now," given that "everything you said [in the past] was false." CW-6 felt that these sentiments were shared by the entire audience, and was surprised when Defendant Klein responded "the Sales Team let him down."

**E. Tintri's June 2017 IPO**

93. On June 1, 2017, Tintri filed a Registration Statement with the SEC on Form S-1 for an offering of up to $100 million in common stock. On June 6, 2017, Tintri filed an amended Registration Statement with the SEC on Form S-1/A, also for an offering of up to $100 million.

94. On June 27, 2017, the Company filed an amended Registration Statement with the SEC

[2] Tintri's fiscal year ends January 31.

on Form S-1/A, and on June 28, 2017, the Company filed another amended Registration Statement with the SEC on Form S-1/A, both with proposed offerings of 10,005,000 shares[3] of Tintri common stock between $10.50 and $12.50 per share, for a proposed maximum aggregate offering value of approximately $125 million.

95. Finally, on June 29, 2017, the Company filed an amended Registration Statement with the SEC on Form S-1/A with an offering of 9,775,000 shares[4] of Tintri common stock between $7.00 and $8.00 a share—a nearly 40% cut from the price proposed just days prior—for a proposed aggregate maximum offering price of approximately $78 million. The Registration Statement dated June 29, 2017 was declared effective by the SEC that same day.[5]

96. On June 30, 2017, the IPO was priced at $7.00 per share. Together with the Prospectus filed with the SEC on Form 424B4 on June 30, 2017, the Registration Statement offered for sale 8,572,000 (plus an additional 1,285,800 shares of common stock to the underwriters) at $7.00 per share. Shares began trading on June 30, 2017, under the NASDAQ symbol "TNTR." The initial closing of the Offering occurred on July 6, 2017, at which time the Company had sold 8,572,000 shares at $7.00 per share for proceeds of approximately $60 million, and net proceeds of approximately $55.8 million after deducting underwriting discounts and commissions of $4.2 million.

97. On August 3, 2017, the Company filed a current report with the SEC on Form 8-K, announcing that pursuant to an agreement with the underwriters, the underwriters had exercised their option to purchase additional shares. A second closing of the IPO occurred on August 1, 2017, during which Tintri sold an additional 1,000,000 shares of common stock to the underwriters, for additional

---

[3] The June 27, 2017 and June 28, 2017 amended Registration Statements proposed an offering of 8,700,000 shares of Tintri common stock to the public, with an additional 1,305,000 shares of Tintri common stock offered to the underwriters should they exercise their option to purchase additional shares.

[4] The June 29, 2017 Registration Statement proposed an offering of 8,500,000 shares of common stock to the public, with an additional 1,275,000 shares of Tintri common stock offered to the underwriters should they exercise their option to purchase additional shares.

[5] As used herein, the term "Registration Statement" refers to, collectively, the Registration Statement that was filed by the Company on June 1, 2017, all amendments thereto, and the Prospectus filed on Form 424B4 on June 30, 2017, which was incorporated into and formed a part of the Registration Statement that became effective on June 29, 2017.

proceeds of $7 million, and additional net proceeds of $6.5 million after deducting underwriting discounts and commissions of $500,000.

98. Upon the completion of the IPO, Tintri thus sold 9,572,000 shares of Tintri common stock at $7.00 per share for total proceeds of approximately $67 million, and net proceeds of approximately $62.3 million.

99. Despite the reduction in the price of shares offered in the IPO, analysts initiated coverage of Tintri in July 2017 with high prospects. For example, a July 25, 2017 report by KeyBanc entitled, "TNTR: Solving Big Problems for Large Customers; Initiating at Overweight with a $9 Price Target," stated that, while "[t]he reduced IPO raise creates some challenges as it limits the margin of error for execution, [] we have confidence in the sales organization's ability to execute." KeyBanc further stated:

> ***<u>We are confident sales force productivity trends will continue</u>*** and the expanding installed base opportunity to execute against our projected revenue growth of 27% in FY18 and 26% in FY19 . . . with solid execution, we would expect Tintri to strengthen its balance sheet.

100. Similarly, a July 25, 2017 report by William Blair entitled, "Delivering a Cloud-Like Experience to Private Data Centers," reported that, despite certain risks faced by the Company, William Blair:

> believe[d] the rising relevance of Tintri's technology in an increasingly virtualized IT world will continue to drive strong revenue growth (three-year expected [compound annual growth rate] of roughly 30%) and steady improvement in margins[,]" such that Tintri offered "an attractive risk/reward equation[.]

101. Likewise, a July 25, 2017 report by Morgan Stanley entitled, "Repeat Purchases and Margin Potential Not Reflected in Valuation; Initiate OW," set a price target of $10 per share—far higher than the opening price of $7.00 per share—due to "strong customer repurchase rates and modest, more *sustainable growth*."

#### 1. Defendants Boast of Supposed Enterprise Cloud Platform Success in Advance of the IPO

102. Leading up to the IPO, Defendants touted the Company's growth and sales. For example, in a March 21, 2017 press release announcing the Company's fourth fiscal quarter 2017 financial results, Tintri "announced strong enterprise cloud momentum[,]" and boasted that "[i]n Q4

of fiscal 2017, Tintri recorded its most $1 million deals in a single quarter."

103. Leading up to the IPO, Defendants also touted the Company's product offerings. For example, in a March 28, 2017 press release, Defendants held Tintri out as "a leading provider of enterprise cloud platforms[,]" which has won "industry awards that recognize Tintri's enterprise cloud solutions[.]" Moreover, Defendants repeated the contention that Tintri is "a leading provider of enterprise cloud platforms" in numerous press releases published in 2017, prior to the IPO.[6]

### 2. In the Registration Statement, Defendants Unlawfully Failed to Disclose that Tintri Had Implemented a New, Misleading Marketing Scheme and the Internal Pushback Therefrom

104. Defendants failed to disclose in the Registration Statement that, prior to the IPO, the Company had implemented a new sales strategy that *required* its sales staff to falsely represent the Company's product offerings as Enterprise Cloud Solutions. Defendants also failed to disclose in the Registration Statement that there was significant pushback to this sales strategy, discontent within the sales department, and ultimately, sales team attrition and high employee turn-over.

105. For example, in a discussion of the Company's sales and marketing, Defendants set forth their supposed marketing strategy, but made no mention of their new sales strategy, sales deck, or sales team push-back:

> *Marketing.* Our marketing is focused on building our brand reputation and market awareness, communicating product and service advantages, driving customer demand and generating leads for our sales force and channel partners. Our marketing team designs and implements a wide range of activities and initiatives, including social media, digital marketing, community events, partner co-marketing and integrated marketing campaigns. In addition, we manage "Tintricity Hub," an online community of customers that share best practices, trade ideas and provide referrals. Over 50% of our advocates are active in any given month. As of April 30, 2017, we had more than 1,200 Tintricity Hub members from approximately 650 companies.

106. Additionally, in the Registration Statement, Defendants set forth Tintri's growth strategy, but were *silent* as to the fact that part of this strategy included representing the Company's

---

[6] This standardized language, which appeared in numerous press releases throughout 2017, was a marked shift from the standardized language the Company had previously employed in press releases. Whereas throughout 2016, Tintri held itself out as a "a leading producer of VM-aware storage (VAS) *for* virtualization and cloud environments," beginning on January 24, 2017, the Company's first press release of 2017, Tintri held itself out as, "a leading provider of enterprise cloud," – or, more simply, an actual provider of enterprise cloud.

products to potential customers as Enterprise Cloud Solutions, when in fact, they were virtualization storage products.

> **Our Growth Strategy**
>
> We intend to extend our position as a leader in providing enterprise cloud solutions to large organizations and CSPs. Key elements of our growth strategy include:
>
> - ***Extend Our Differentiation in Enterprise Cloud through Continued Software Innovation***. We plan to continue to invest in enhancing our CONNECT architecture and our enterprise cloud platform, and extending our portfolio of software products, thereby driving cross-selling and attach rates.
> - ***Pursue Additional Large Organizations and CSPs***. We intend to continue our sales efforts to further penetrate the Global 2000 enterprises and CSPs with the most demanding workloads and complex cloud requirements.
> - ***Leverage Line of Business Buyers to Accelerate Adoption***. We intend to continue to focus on selling to line of business buyers, who generally have their own IT budgets, and leverage those relationships to sell more broadly within their organizations.
> - ***Increase Sales to Installed Base***. We intend to continue expanding our footprint with our existing customers by supporting additional use cases and selling additional software products. These additional use cases include data protection and disaster recovery, to expand our total addressable market.
> - ***Expand Sales and Marketing Presence in New and Existing Markets***. We plan to expand our presence in both existing and new markets, including territories in the Middle East, Asia and Europe.
> - ***Support Value-Add Channel Partners***. We expect to focus our efforts on supporting those partners offering cloud services, including infrastructure "stacks" that include our solutions.
> - ***Expand and Deepen Technology Partnerships and Integrations***. We intend to expand and deepen our relationships with leading technology companies. We expect to continue to work closely with our partners to achieve certifications and integrations as well as to seek additional partnerships that will allow us to address new customer use cases and deployments.

107. Moreover, despite more than thirty pages of risk disclosures, Defendants failed to disclose in the Registration Statement the risks associated with the Company's new sales strategy, including that customers would be less inclined to purchase products that were falsely marketed, which risked driving down sales and revenue, and also that its own salespeople would leave the

Company *en masse* as a result of being pressured to engage in misleading marketing efforts.

**3. In the Registration Statement, Defendants Misrepresented that the Company Offered an "Enterprise Cloud Solution"**

108. In the Registration Statement, Defendants also repeatedly, affirmatively misrepresented Tintri's product offerings as "Enterprise Cloud Solutions" or "Enterprise Cloud Platforms."

109. For example, the Registration Statement affirmatively misrepresented the Company's mission as:

> Our mission is to provide large organizations and cloud service providers with an enterprise cloud platform that offers public cloud capabilities inside their own data centers and that can also connect to public cloud services.

110. Additionally, the Registration Statement affirmatively misrepresented that Tintri's products met the requirements of enterprise cloud:

> ***Our enterprise cloud platform solution and software products address the key enterprise cloud requirements***, and deliver them through a mix of on-premises storage hardware, value-added storage software and SaaS-based software services for virtualized environment.

(emphasis added).

111. More egregious still, in the Registration Statement, Defendants not only misrepresented that Tintri offered Enterprise Cloud Solutions—which it did not—but also, that it was *successful* doing so:

> ***We Successfully Sell Enterprise Cloud to Large Organizations and CSPs.*** We sell to a growing list of large organizations and CSP customers. Our value proposition to these customers is particularly compelling[.]

112. All of these statements, and additional statements like them, were false or misleading because they misrepresented Tintri's product offerings. *See* Sec. VI, *infra*.

**4. Despite the False and Misleading Registration Statement and Prospectus, the IPO Is a Disappointment**

113. Although Defendants boasted of the success of Tintri's supposed "Enterprise Cloud Solutions" prior to the IPO, and failed to inform investors in the Registration Statement that the Company had implemented a new sales strategy that misrepresented its product offerings or the pushback therefrom, the IPO was still a disappointment.

114. Forced to slash its opening share price from between $10.50 and $12.50 per share (for a

proposed maximum aggregate offering value of approximately $125 million) to $7.00 per share, Tintri ultimately raised net proceeds of just $67 million, or only half of its intended offering value. *See* ¶¶94-98, *supra*.

115. As such, following the IPO, it became increasingly unlikely that Tintri would be able to reach its fully funded model without needing to raise additional capital through secondary offering(s) or debt financing.

116. Indicating that poor sales performance was, at least in part, responsible for the disappointing IPO, in a current report filed with the SEC on Form 8-K after the market close on August 21, 2017, Defendants revealed that:

> On August 21, 2017, Tintri, Inc. (the "Company") announced changes to the structure of its sales organization. Effective August 21, 2017, Michael McGuire ceased to serve as Chief Sales Officer of the Company . . . Starting August 21, 2017, the Company will flatten the structure of its sales organization.

117. In response to Michael McGuire's departure, analysts lowered expectations for the second fiscal quarter 2018. A September 8, 2017 report by Morgan Stanley entitled, "Sales Turnover Slows Growth; Reduce PT to $4.50," stated:

> We lower medium-term revenue growth forecast to reflect turnover of ramped sales people. We now forecast a 17% FY17-20 revenue CAGR compared to 24% previously.
>
> * * *
>
> On August 21st, Tintri announced the departure of Chief Sales Officer, Michael McGuire. Given the timing of his departure near quarter-end, we felt it was reasonable to assume revenue could disappoint and lowered our forward revenue estimates by roughly 5%. Given additional departures of ramped sales people, the impact to revenue is much larger than we originally expected.

### F. Tintri Reports Revenue at the Low End of Expectations for the Second Fiscal Quarter 2018 and Lowers Expectations for the Third Fiscal Quarter 2018

118. On September 7, 2017, Tintri issued a press release announcing its financial results for the second fiscal quarter 2018, including quarterly revenue of $34.9 million as compared to analysts' expectation of $35.7 million. Defendant Klein disclosed therein that "'[T]he company's revenue came in at the low end of our expectations[.]'" For the third fiscal quarter 2018, ending October 31, 2017, the Company reported that it expected revenue in the range of $36 to $37 million compared to

analysts' expectation of $42.5 million.

119. After the market close on September 7, 2017, the Company also held an earnings call for the second fiscal quarter 2018, during which Defendant Klein admitted that: "***Q2 revenue grew 27% over the same quarter a year ago, at the low end of expectations. This is primarily due to distraction, disruption and some sales attrition that occurred during and after [the Company's] IPO***." Further, Defendant Halifax reiterated that the Company was lowering expectations for the third fiscal quarter 2018, explaining that: "We expect revenues for the quarter to be in the range of $36 million to $37 million, and we expect non-GAAP loss per share to be in the range of $0.77 to $0.81."

120. In light of these disappointing financial results, during the September 7, 2017 earnings call, Defendant Klein announced a reorganization of the sales department, and alluded to a wider employee lay-off, stating: "Following Mike McGuire's departure as Chief Sales Officer, we have flattened our sales organization by moving to 2 sales regions: North America and international. I have assumed the leadership of our global sales force[.]"

121. When questioned by analysts during the September 7, 2017 earnings call, Defendants blamed the disappointing results, at least in part, on sales team attrition, but dodged questions on slowing momentum:

> William Blair: [Y]ou haven't given guidance for Q4. You just talked about some improving momentum toward the end of the year here. But if I roll through Q3 to Q4 and I assume some type of reasonable growth from Q3 to Q4, it's still going to leave me with almost no growth year-over-year. So how would we be thinking about the growth profile of the business at this point? I mean***, you had talked about pre-IPO like a 30%-type growth. Obviously, that is not going to be the case for the second half of the year and probably not in the first half of next year given the comps***. So maybe just first, how do we think about growth at this point? and then ***what has really changed to cause growth to stall out*** here?
>
> Defendant Halifax: . . . [T]he Q2 revenue was slightly lower than we'd hoped . . . As a result, we're just being very focused on being – caution on our guidance for Q3, and I wouldn't expect to see any strong return to growth in Q4.
>
> William Blair: . . . [T]hat didn't really answer my question . . .

122. Similarly, when asked specific questions by analysts concerning sales team attrition, Defendants acknowledged the problem, but withheld information:

Morgan Stanley: I wonder if you could provide some color as to how many quota-carrying

> sales reps you have. I think last quarter you said it was 70. Did you see turnover in that base? . . . [T]he metrics in the business look okay, but you're guiding revenue down 15% in October. So just trying to understand what might be going on in the sales force beyond the head of that business leaving?
>
> Defendant Halifax: [W]e are not going to disclose the absolute number of sales teams or ramp sales team. What I can tell you is that ***we did lose a small number of ramp sales team***.

123. Ultimately, when pushed further by an analyst from Bank of America during the September 7, 2017 earnings call, Defendant Klein admitted that: "clearly retention bit us to a certain degree[.]"

124. In response to this news, the price of Tintri shares plummeted, falling from $6.68 per share on September 7, 2017 to close at $4.55 on September 8, 2017.

125. Analysts were also quick to express their disappointment. A report published by Piper Jaffray on September 7, 2017, entitled "Weak IPO Creates Disruption, Causing FQ2 Miss and Guide Down. Neutral, PT to $6.50," expressed deepening concern for the Company's "decelerating revenue growth" and high cash burn, leading Piper Jaffray to decrease its target price from $8.50 to $6.50 – a staggering decrease and less than the $7.00 per share opening price of Tintri's stock in the IPO. Piper Jaffray also highlighted the "decelerating revenue growth[,]" reporting:

> Management guided for FQ3 revenue of $36-$37M, which was well below the Street estimate of $42.8M. The midpoint of the range equates to just 7.7% Y/Y growth, which is a ***significant deceleration*** from the 26.5% the company generated in FQ2 (Jul). This implies product revenue of roughly $28M, which is just 3.9% Y/Y growth.

126. Similarly, a report published by William Blair on September 8, 2017, entitled "Between a Rock and Hard Place; Downgrading to Market Perform," "substantially lower[ed] [William Blair's] revenue and non-GAAP EPS estimates," explaining that:

> We are now expecting 15% revenue growth in fiscal 2018 and roughly 10% revenue growth for fiscal 2019 through 2021 (compared with our prior estimate of roughly 30% growth). Our primary concern is that Tintri faces a catch-22 situation: it needs to reaccelerate growth to regain investor confidence but its weak balance sheet requires that it tread very lightly on investments. This requires a leap of faith that Tintri can thread the needle to drive materially higher productivity from existing resources, which feels like a long shot in the fiercely competitive storage market. Put differently, while many of its competitors are stepping on the gas, Tintri needs to pump the brakes—not exactly a formula for success in a hyper-competitive market.

127. Further, an article published by Seeking Alpha on September 8, 2017, entitled, "Tintri – The Next Violin Memory In the Making," reported: "Recent IPO stumbles right out of the gate by reporting disappointing quarterly results and issuing abysmal forward guidance." More concerning still, the article also warned that given the "abysmal revenue outlook," the Company's "meaningful amount of debt[,]" and its apparent inability to "keep up with its larger competitors[,]" it was "at risk of going bankrupt in the not too distant future."

128. Next, an article published by Seeking Alpha on September 11, 2017, entitled, "Tintri: Next Stop, Oblivion," further reported:

- Tintri reported an extremely weak Q2, with both revenues and margins far below estimates.
- Shares crashed 32% to an all-time low of $4.60 after the announcement.
- With only $12 million of net cash left on its balance sheet and a burn rate of ~$82 million, the company is one breath away from bankruptcy.

129. In response, Tintri's stock price continued to fall from $4.55 per share on September 8, 2017, to close at $4.46 per share on September 12, 2017.

**G. As the Stock Price Continues to Tumble, Tintri Announces Large Employee Lay-Off**

130. The bad news for Tintri continued. On September 18, 2017, the Board approved a restructuring plan, including a reduction in employees. On September 20, 2017, Tintri formally announced "a little more than a 10%" headcount reduction of its entire global workforce (approximately 60 employees). *See* 09/20/2017 Form 8-K. The Company represented that it expected to substantially complete the restructuring plan in its third quarter of fiscal 2018, which ended on October 31, 2017. *See id.* To execute the plan, Tintri estimated that it would be forced to incur between $1.6 million and $1.8 million in expenses, "substantially all of which relate[d] to severance costs." *Id.*

131. Although Defendants had alluded to a lay-off during the September 7, 2017 earnings call when they represented that the sales organization had been "flattened," analysts were surprised at the size of the cuts. In a report entitled, "Tintri Announces 10% Headcount Reduction. Lowering PT

to $4.50; Neutral," Piper Jaffray stated: "the 10% headcount reduction was slightly more than we were expecting." Piper Jaffray further explained that: "[W]e believe there is still significant risk of increased attrition and a decline in sales productivity, which would pressure sales growth. As such, we are lowering our price target to $4.50 (prev $6.50)."

132. In response, Tintri's stock price fell from $4.11 on September 18, 2017 to $3.66 on September 19, 2017, and continued to tumble to close at $2.96 on September 21, 2017, as news of the lay-off leaked out.

### H. Tintri Misses Revenue Expectations for the Third Fiscal Quarter 2018 and Defendants Announce Possible Sale of Business

133. On December 13, 2017, Tintri issued a press release announcing its financial results for the third fiscal quarter 2018 ended October 31, 2017, in which Defendant Klein admitted that: "we are disappointed with Q3 revenue. The company was impacted by delayed and reduced purchases by some accounts[.]" Specifically, the Company reported revenue of just $31.8 million for the third fiscal quarter 2018, as compared to the Company's expectation of $36 million to $37 million – which had *already* been revised down on September 7, 2017, and the consensus of $36.6 million – a whopping miss.

134. More concerning still, the Company revealed in its December 13, 2017 press release that Tintri's growth rate was continuing to decline – a trend that had, unbeknownst to investors, begun prior to the IPO, when the Company unsuccessfully attempted to market its product offerings as Cloud Enterprise Solutions. Specifically, quarterly revenue for the third fiscal quarter 2018 was "down 6% year-over-year[.]" Accordingly, the Company expected "[r]evenue in the range of $25 to $27 million" for the fourth fiscal quarter 2018, approximately 39% below consensus of $42.9 million. Due to the disappointing financial results, Tintri revealed in its December 13, 2017 press release that it was "exploring strategic options available to the company[.]"

135. After the market close on December 13, 2017, the Company also held an earnings call for the third fiscal quarter 2018, during which Defendant Klein stated: "Q3 revenue of $31.8 million fell 6% compared to the same quarter a year ago." During the call, Defendant Klein blamed these disappointing results on: "delayed and reduced purchases from some customers in our pipeline. We

believe that many of the purchase delays that we've seen stem primarily from concern about the strength of our balance sheet . . . and, to a lesser extent, the realignment of our sales force[.]"

136. With regards to the "realignment" of the Company's sales force, during the December 13, 2017 earnings call, Defendant Halifax stated that: "Total headcount at the end of Q3 was 508, down 76 sequentially, resulting from the cost-reduction actions we took in the quarter."

137. Signaling that the Company was facing pressures in its balance sheet, during the December 13, 2017 earnings call, Defendant Halifax informed investors that Tintri was "in discussions to modify some of the terms of some of [its] outstanding debt[,]" and was "exploring available strategic options to deliver value to [its] shareholders, *including the sale of the company* and optimization of [its] operating model to significantly reduce [the Company's] cash burn rate and shorten the time to cash generation."

138. Also during the December 13, 2017 earnings call, analysts questioned *why* revenue was continuing to decline when the Company's customer base was increasing, to which Defendant Klein explained that Tintri had failed to close midsize deals:

> Piper Jaffray: [Y]our total customer base is up about 26% year-over-year . . . yet revenue is still down on a year-over-year basis. And with that kind of growth in customers, you would think revenue would still have to be up year-over-year . . . I realize some of the deals may have slipped out of the quarter[,] but that doesn't explain why revenue is down year-over-year. So can you just give us more color on that dynamic?
>
> Defendant Klein: [T]hat has to do with order sizes. And so our business in the sort of sub-$400,000 sort of bracket of the business is what we would have expected. The deals above $1.2 million generally were consistent with prior quarters, but the – in the band between approximately $400,000 and $1 million, we did see softness in the business. We just saw fewer sort of midsize deals this quarter.

139. Demonstrating the importance of sales team retention and productivity, during the December 13, 2017 earnings call, analysts again questioned "what are the number of sales teams [that] they running right now" and "how many sales teams left?" to which Defendants refused to answer.

140. In reports issued after the earnings call, analysts highlighted slowing product sales, as well as the possibility of a sale of the business due to Tintri's increasingly dire financial situation. In a December 14, 2017 report entitled "Mounting Headwinds Drive Strategic Evaluation," Morgan Stanley stated that: "disappointing sales leads management to explore strategic options, including a

sale of the business. Morgan Stanley further explained that: "Deals slipped across many customer segments during F3Q1[8], but deals in the $400k-$1M band saw particular weakness driven by customer concerns about the strength of Tintri's balance sheet and, to a lesser extent, realignment of the sales force."

141. Similarly, in a December 14, 2017 report entitled "Another Tough Quarter; Potential Sale on the Table," William Blair reported that: "Tintri disappointed investors with another revenue miss and guidance substantially below consensus estimates." William Blair explained: "Revenue was well below guidance, primarily due to delayed and reduced purchases from existing and prospective customers in the pipeline . . . Product sales (72% of total) decline 15% year-over-year and decreased 14% sequentially." William Blair warned that:

> [W]e worry that top-line growth and margin expansion will continue to be elusive. Meanwhile, heavy cash burn is likely to pressure the balance sheet for the foreseeable future. Thus, we think the best scenario for Tintri is to sell itself to a strategic buyer.

142. Finally, a December 14, 2017 report by Seeking Alpha entitled, "Tintri: The Nightmare Continues," stated: "Tintri reported Q3 results that underwhelmed heavily on growth. Revenues actually declined 6% y/y." While other analysts hinted at the need for Tintri to sell its business, Seeking Alpha expressed that such a sale would be very difficult: "With a company in dire straits that is seeking to sell itself as a means of survival, hoping for potential suitors to pay a big premium (if any at all) is wishful thinking. Tintri looks more like a firesale." Indeed, Seeking Alpha characterized Tintri's IPO as "undoubtedly" the "worst of the worst" IPOs that were floated to the market in 2017.

143. In response, the price of Tintri's stock fell from $5.48 per share on December 13, 2017, to close at $5.41 per share on December 14, 2017 – a larger drop only staunched by investors' hope that Tintri would sell its business and save investors further losses.

## V. DISCLOSURE OBLIGATIONS UNDER THE SECURITIES ACT

144. "The Securities Act of 1933 . . . was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud, and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976); *see also Randall v.*

*Loftsgaarden*, 478 U.S. 647, 659 (1986) (The Securities Act aims "to place adequate and true information before the investor"); *Pinter v. Dahl*, 486 U.S. 622, 638 (1988) ("The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce.").

145. To effectuate this purpose, a Company's registration statement must provide a full disclosure of material information. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983). Failure to do so gives rise to private rights of action under the Securities Act. *Id.* at 381-82 (Private rights of action were "designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering"); *see also* 15 U.S.C. § 77k(a).

**A. Section 11 Disclosure Requirements**

146. Section 11 prohibits materially misleading statements or omissions in registration statements filed with the SEC. *See* 15 U.S.C. § 77k. Accordingly, Section 11 gives rise to liability if "any part of [a company's] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 11 provides for a cause of action by the purchaser of a registered security against certain statutorily enumerated parties, including: "(1) every person who signed the registration statement; (2) every person who was a director . . . at the time of the filing of . . . the registration statement with respect to which his liability is asserted; (3) every person who, with his consent, is named in the registration as being or about to become a director [;]" (4) "any person . . . who has with his consent been named as having prepared or certified any part of the registration statement[;]" and (5) "every underwriter with respect to such security." 15 U.S.C. § 77k(a)(1-5).

**B. Section 12 Disclosure Requirements**

147. Section 12 prohibits materially misleading statements or omissions in prospectuses or oral communications. *See* 15 U.S.C. § 77l(a)(2). Section 12 provides for a cause of action by the purchaser of a registered security against a "statutory seller." *Id*. An individual is a "statutory seller" if

he (1) "passed title, or other interest in the security, to the buyer for value[,]" or (2)"successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter*, 486 U.S. at 642, 647.

**C. Disclosure Requirements Under Regulation S-K**

**1. Item 303 Disclosure Requirements**

148. Item 303 imposes an affirmative duty on issuers to disclose "known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way." *S.E.C. Release No. 6835*, 1989 WL 1092885, at *4; *see also* 17 C.F.R. § 229.303(a)(3). "Disclosure of known trends or uncertainties that the registrant reasonably expects will have a material impact on net sales, revenues, or income from continuing operations is also required. *Id.*

149. Pursuant to Item 303(a), for a fiscal year, a registrant thus has an affirmative duty to:

> i. Describe any *unusual or infrequent events or transactions* or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected.
>
> ii. Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(i)-(ii) (emphasis added); *see also S.E.C. Release No. 6835*, 1989 WL 1092885, at *8 (May 18, 1989) ("Other non-recurring items should be discussed as unusual or infrequent events or transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation omitted).

150. Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact of results, must be disclosed. Examples of such *required* disclosures include: "[a] reduction in the registrant's product prices; erosion in the r[e]gistrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract." *S.E.C. Release No. 6835*, 1989 WL 1092885, at *4 (May 18, 1989).

151. Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information." *See Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation*, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." *Id.* at *3, *17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations*, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

**2. Item 503 Disclosure Requirements**

152. Item 503 is intended "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." *Sec. Offering Reform*, S.E.C. Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004). Accordingly, Item 503 requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 CFR § 229.503(c). The discussion of risk factors:

> must be specific to the particular company and its operations, and should explain how the risk affects the company and/or the securities being offered. Generic or boilerplate discussions do not tell the investors how the risks may affect their investment.

*Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers*, 1998 WL 425894, at *14 (July 29, 1998).

153. Put simply, Item 503 provides that a registration statement must disclose all known material risks that are "specific to the particular company and its operations." 17 CFR § 229.503(c). Item 503(c) warns issuers: "Do not present risks that could apply to any issuer or any offering." *Id.*

**D. Defendants Violated Their Disclosure Obligations in the Registration Statement**

154. Defendants violated their disclosure obligations in the Registration Statement because

they failed to disclose that: (a) leading into the IPO, the Company implemented a new sales strategy that required its sales staff to misrepresent, and indeed, to over-sell Tintri's product capabilities as Enterprise Cloud Solutions, when their products were only virtualized storage products; (b) sales staff pushed back against the Company's new, misleading sales strategy; and (c) the risks associated with the Company's new sales strategy, including that customers would be less inclined to purchase products that were falsely marketed, which risked driving down sales and revenue. Their failure to disclose these material facts and risks violated Section 11, Section 12, and Item 503. Additionally, Defendants' failure to disclose Tintri's transition away from its tried and true sales message that Tintri was a VM-aware storage company, to the new (false) sales pitch that Tintri was an Enterprise Cloud Solutions company, also violated Item 303 given that Tintri was actively engaged in a business strategy that it reasonably expected to have a material, unfavorable impact on revenue.

## VI. THE REGISTRATION STATEMENT CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS AND/OR OMITTED MATERIAL INFORMATION REQUIRED TO BE STATED THEREIN

155. On June 30, 2017, Defendants sold 8,572,000 shares (plus an additional 1,285,800 shares of common stock to the underwriters) of common stock in an IPO pursuant to the Registration Statement. The Registration Statement contained untrue statements of material facts and omitted to state other facts necessary to make the statements not misleading under the circumstances in which they were made.

156. The Registration Statement boasted:

> ***<u>Our enterprise cloud platform solution and software products address the key enterprise cloud requirements</u>***, and deliver them through a mix of on-premises storage hardware, value-added storage software and SaaS-based software services for virtualized environment.

157. The statement identified in Paragraph 156 above was materially false and misleading when made because it affirmatively misrepresented that: (1) Tintri's product offering was an "enterprise cloud platform solution," when in fact, Tintri's products were virtualization storage products; and (2) Tintri's products addressed the "key enterprise cloud requirements," when in fact, to be an enterprise cloud, a product must provide processing, storage, networking, and software, yet Tintri's products *only* provided storage, and to a lesser extent, *some* software offerings.

158. In the Registration Statement, Defendants also misrepresented that:

> ***We Successfully Sell Enterprise Cloud to Large Organizations and CSPs.*** We sell to a growing list of large organizations and CSP customers. Our value proposition to these customers is particularly compelling[.]

(Emphasis in original).

159. The statement identified in Paragraph 158 above was materially false and misleading when made because it affirmatively misrepresented that: (1) Tintri's product offering was an "Enterprise Cloud," when in fact, Tintri sold only virtualization storage products; (2) Tintri was "successfully" selling enterprise cloud to customers when it had no such product in its portfolio; (3) the Company was selling to a "growing list" of customers, when in fact, customers were less likely to purchase a product that was not as the Company had represented; and (4) the Company's "value proposition" was "compelling," when in fact, sales and revenue were being negatively impacted by Tintri's new sales strategy and discontent and attrition within the sales department.

160. With regards to Tintri's supposed growth strategy, Defendants represented in the Registration statement that:

> **Our Growth Strategy**
>
> We intend to extend our position as a leader in providing enterprise cloud solutions to large organizations and CSPs. Key elements of our growth strategy include:
>
> - ***Extend Our Differentiation in Enterprise Cloud through Continued Software Innovation***. We plan to continue to invest in enhancing our CONNECT architecture and our enterprise cloud platform, and extending our portfolio of software products, thereby driving cross-selling and attach rates.
>
> - ***Pursue Additional Large Organizations and CSPs***. We intend to continue our sales efforts to further penetrate the Global 2000 enterprises and CSPs with the most demanding workloads and complex cloud requirements.
>
> - ***Leverage Line of Business Buyers to Accelerate Adoption***. We intend to continue to focus on selling to line of business buyers, who generally have their own IT budgets, and leverage those relationships to sell more broadly within their organizations.
>
> - ***Increase Sales to Installed Base***. We intend to continue expanding our footprint with our existing customers by supporting additional use cases and selling additional software products. These additional use cases include data protection and disaster recovery, to expand our total addressable market.

- ***Expand Sales and Marketing Presence in New and Existing Markets***. We plan to expand our presence in both existing and new markets, including territories in the Middle East, Asia and Europe.

- ***Support Value-Add Channel Partners***. We expect to focus our efforts on supporting those partners offering cloud services, including infrastructure "stacks" that include our solutions.

- ***Expand and Deepen Technology Partnerships and Integrations***. We intend to expand and deepen our relationships with leading technology companies. We expect to continue to work closely with our partners to achieve certifications and integrations as well as to seek additional partnerships that will allow us to address new customer use cases and deployments.

161. The statement identified in Paragraph 160 above was materially false and misleading when made because it affirmatively misrepresented that: (1) Tintri's product offering was an "enterprise cloud solution," when in fact, Tintri sold only virtualization storage products; (2) Tintri was a "leader" in providing enterprise cloud solution when it had no such product in its portfolio; (3) Tintri would "continue [its] sales efforts[,]" when in fact, the Company had implemented a major shift in sales strategy that required sales staff to misrepresent Tintri's products as Enterprise Cloud Solutions; and (4) Tintri would "continue expanding [its] footprint[,]" when in fact, sales and revenue were being negatively impacted by Tintri's new sales strategy and discontent and attrition within the sales department. The statement identified in Paragraph 160 above was also materially false and misleading when made or failed to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading, because it failed to disclose that: (1) Tintri had implemented a new sales strategy that *required* its sales staff to falsely represent the Company's product offerings as Enterprise Cloud Solutions; and (2) there was significant pushback to this sales strategy, discontent within the sales department, and ultimately, sales team attrition and high employee turn-over.

162. Further, in the "Risk Factors" section of the Registration Statement, Defendants misleadingly warned investors that:

> ***If the enterprise cloud market does not evolve as we anticipate or our target customers do not adopt our enterprise cloud solutions, we may not be able to compete effectively, and our ability to generate revenue will suffer.***

> ***<u>We compete in the new enterprise cloud category</u>*** with our Tintri VMstore solutions, and the market for enterprise cloud solutions is still in an early stage. Our success depends upon our ability to provide enterprise cloud infrastructure solutions that address the needs of customers more effectively and economically than those of other competitors or existing technologies.
>
> Many of our target customers have never purchased enterprise cloud infrastructure solutions and may not have the desire or available budget to invest in new technologies such as ours. Market awareness of our value proposition will be essential to our continued growth and our success, particularly for the enterprise and CSP markets. It is difficult to predict with any precision customer adoption rates, customer demand for our solution or the future growth rate and size of our market.
>
> Changes or advances in alternative technologies or adoption of alternative enterprise cloud infrastructure offerings could adversely affect the demand for our solution. If the enterprise cloud infrastructure market does not develop in the way we anticipate, if our solution does not offer benefits compared to competing solutions or if customers do not recognize the benefits that our solution provides, then our business, operating results and financial condition could be adversely affected.

(italicized emphasis in original, underlined emphasis added).

163. The risk factor identified in Paragraph 162 above was itself materially false and misleading when made because it affirmatively misrepresented that Tintri "compete[d] in the new enterprise cloud category[,]" when in fact, Tintri sold only virtualization storage products that competed against legacy file storage providers and cloud-enabled storage providers, but not cloud or enterprise cloud providers. The risk factor identified in Paragraph 162 above was also misleading because it gave the false impression that the risks faced by the Company were those associated with "enterprise cloud," which Tintri did not actually provide.

164. Also in the "Risk Factors" section of the Registration Statement, Defendants misleadingly warned investors that:

> ***Our growth depends in part on our ability to attract new customers and sell additional solutions and renewals to existing customers.***
>
> Our future success depends in part on our ability to increase sales of our solution to new customers domestically and internationally, as well as to increase sales of additional solutions and renewals to our existing customers. ***<u>The rate at which new and existing customers purchase solutions depends on a number of factors, including customers' perceived need for enterprise cloud infrastructure solutions</u>***, general economic conditions and our ability to compete effectively with our competitors. We may also be forced to engage in sophisticated and costly sales efforts, which may not result in additional sales.

> Furthermore, ***the rate at which our customers purchase additional enterprise cloud infrastructure solutions*** is subject to a number of risks, including the nature and extent of their IT infrastructure needs, their level of satisfaction with our prices and features relative to competitive offerings, their spending levels on IT infrastructure solutions and other factors outside of our control.

(italicized emphasis in original, underlined emphasis added).

165. The risk factor identified in Paragraph 164 above was itself materially false and misleading when made because it affirmatively misrepresented that the rate at which customers purchased Tintri's products depended upon "customers' perceived need for enterprise cloud infrastructure solutions[,]" when Tintri did *not* offer enterprise could solutions, and thus, the rate at which Tintri's customers purchased their products could not possibly depend on customers' perceived need for enterprise cloud. The risk factor identified in Paragraph 164 above was also misleading because it gave the false impression that the risks faced by the Company were those associated with "enterprise cloud," which Tintri did not actually provide.

166. Additionally, in the "Risk Factors" section of the Registration Statement, Defendants misleadingly warned investors that:

> Although ***we have a channel sales model***, our sales representatives typically engage in direct interaction with our prospective customers. Therefore, we continue to be substantially dependent on our sales force to obtain new customers and sell additional solutions to our existing customers.

167. The risk factor identified in Paragraph 166 above was itself materially false and misleading when made because it affirmatively misrepresented that the Company relied upon a channel sales model, when in fact, Tintri used a land-and-expand sales strategy, which was particularly impacted by the Company's new sales strategy requiring sales staff to falsely represent the Company as an Enterprise Cloud Solution.

168. Under the Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), Defendants falsely reported:

> ***Our mission is to provide large organizations and cloud service providers with an enterprise cloud platform that offers public cloud capabilities inside their own data centers and that can also connect to public cloud services***.
>
> ***Our highly-differentiated and extensible enterprise cloud platform combines cloud management, web services software and a range of all-flash storage systems*** . . .

> ***Our enterprise cloud platform*** enables organizations to easily scale to support tens of thousands of virtual machines on a single system across multiple hypervisors and containers and to connect to public cloud environments.
>
> Our solution helps our customers optimize infrastructure by significantly simplifying deployment and operations, which can lead to substantial reductions in capital expenditures and operating expenses. We sell many of our software products separately from ***our core enterprise cloud solution***, enabling our customers to tailor their enterprise cloud infrastructure to their specific needs. Our platform addresses a large variety of use cases, including development operations, disaster recovery and data protection, server virtualization and desktop virtualization. Following our first product launch in March 2011, we ***continue to be a leader in providing enterprise cloud solutions for virtualized and cloud environments***.

(emphasis added).

169. The statement identified in Paragraph 168 above was materially false and misleading when made because it affirmatively misrepresented that: (1) Tintri's mission was to provide "an enterprise cloud platform[,]" when it had no such product in its portfolio, and indeed, had no product roadmap to offer such products in the future; (2) Tintri's product was an "enterprise cloud platform" or the Company's "core enterprise cloud solution," when in fact, Tintri's products were virtualization storage products; and (3) Tintri was a "leader" in providing enterprise cloud solution when it had no such product in its portfolio.

170. Also in the MD&A section of the Registration Statement, Defendants stated: "***Our product revenue is derived from sales of our enterprise cloud platform products***, which consists of our VMstore systems, and stand-alone software licenses[.]"

171. The statement identified in Paragraph 170 above was materially false and misleading when made because it affirmatively mispresented that Tintri derived its product revenue from "sales of [its] enterprise cloud platform products," when Tintri's products were virtualized storage products, not enterprise cloud platform products.

172. Additionally, in the MD&A section of the Registration Statement, Defendants stated:

> We believe our business model supports a financial model that is characterized by the following attributes:
>
> - ***Strong Revenue Growth***. Our revenue has grown from $49.8 million in fiscal 2015 to $86.0 million in fiscal 2016 and to $125.1 million in fiscal 2017, representing year-over-year growth of 73% and 45%, respectively, for our two most recent fiscal years and $22.9 million in the three months ended

April 30, 2016 to $30.4 million in the three months ended April 30, 2017, representing period-over-period growth of 33%. We believe our strong revenue growth has resulted primarily from:

– ***Market Adoption of Our Solution***. ***<u>We have invested considerable resources in promoting market awareness of our solution and we believe these efforts have contributed to the adoption of our solution by large organizations and CSPs</u>***.

– ***New Stand-Alone Software Additions***. We continue to expand our product suite, and our stand-alone software product portfolio in particular has experienced rapid adoption by customers. Our stand-alone software product attach rate, which is stand-alone software license revenue as a percentage of product revenue, increased from 9.9% in fiscal 2016 to 14.7% in fiscal 2017, and from 11.1% in the three months ended April 30, 2016 to 17.4% in the three months ended April 30, 2017.

– ***Increased Sales Coverage and Effectiveness***. ***<u>Our sales teams have become more productive</u>***. Our ramped teams, which we define as sales teams who have been in their role for more than 180 days, have increased from 34 as of January 31, 2015 to 52 as of January 31, 2016 to 54 as of January 31, 2017 to 56 as of April 30, 2017. Our average productivity per ramped team, which we define as bookings per ramped team for a particular period, increased from $633,000 for the quarter ended January 31, 2015 to $694,000 for the quarter ended January 31, 2016 to $839,000 for the quarter ended January 31, 2017, representing year-over-year increase in productivity of 10% and 21% in our two most recent fiscal years. Our average productivity per ramped team increased from $399,000 for the quarter ended April 30, 2016 to $566,000 for the quarter ended April 30, 2017, representing period-over-period increase of 42%. We define bookings as noncancellable orders received during the fiscal period. 37% and 34% of our ramped teams achieved bookings over $875,000 in the quarter ended January 31, 2017 and April 30, 2017, respectively. As our sales coverage and effectiveness has increased, our global customer base has grown rapidly from 573 as of January 31, 2015 to 928 as of January 31, 2016 and to 1,273 as of January 31, 2017, representing year-over-year growth of 62% and 37% for our two most recent fiscal years, and from 1,009 as of April 30, 2016 to 1,338 as of April 30, 2017, representing period-over-period growth of 33%.

– ***Increased Transaction Value***. As our customer base has grown, we have also experienced an increase in high value transactions. The number of orders valued at greater than $1 million increased from three in fiscal 2015 to five in fiscal 2016 to 13 in fiscal 2017. Our average order size has grown from $111,000 for the year ended January 31, 2015 to $142,000 for the year ended January 30, 2016 to $160,000 for the year ended January 31, 2017. Our average order size has grown from $111,000 for the three months ended April 30, 2015 to $124,000 for the three months ended April 30, 2016 to $138,000 for the three months ended April 30, 2017.

- ***Expansion Among Existing Customers***. Many of our customers purchase from us on a quarterly basis and increase their spend with us over time. For example, our top 25 customers (as measured by their cumulative orders through January 31, 2017) that have been customers for at least twelve months have on average cumulatively ordered more than 19x the amount they ordered from us in their first quarter as a customer. For all customers that have been customers for twelve months or more, this metric is 3x. These metrics are inclusive of amounts contracted for support and maintenance revenue and cumulative order metrics are inclusive of amounts ordered in the applicable customers' first quarter as customers.

- ***Gross Margin Expansion***. Our gross margin has expanded to 65% in fiscal 2017. We believe this expansion is due to the following factors:

* * *

– ***Repeat Purchases from Existing Customers***. After their initial purchase, our customers tend to increase their subsequent purchase orders with more systems and higher-margin stand-alone software products.

(italicized emphasis in original, underlined emphasis added).

173. The statement identified in Paragraph 172 above was materially false and misleading when made because it affirmatively represented that: (1) the resources the Company had invested in promoting its products "contributed to the adoption of [Tintri's] solution[,]" when in fact, leading up to the IPO, sales and revenue were being negatively impacted by the Company's new sales strategy that required sales staff to misrepresent Tintri's product offerings as Enterprise Cloud Solutions; and (2) sales team productivity was increasing, when in fact, there was significant pushback to the Company's new sales strategy, discontent within the sales department, and sales team attrition.

174. In the "Business Overview" section of the Registration Statement, Defendants stated:

> ***<u>Our mission is to provide large organizations and cloud service providers with an enterprise cloud platform that offers public cloud capabilities inside their own data centers and that can also connect to public cloud services</u>***.
>
> ***<u>Our highly-differentiated and extensible enterprise cloud platform combines cloud management software, web services and a range of all-flash storage systems. Our enterprise cloud platform not only delivers many of the benefits of public cloud infrastructure, but also gives organizations the control and functionality they need to run both enterprise and cloud-native applications in their own private cloud</u>***. Organizations use our platform as a foundation for their own private clouds—to build agile development environments and run mission-critical enterprise applications. We enable users to guarantee the performance of their

> organization's applications, automate common IT tasks to reduce operating expenses, troubleshoot across compute, storage and network, predict their organization's needs to scale and provide needed elasticity on demand. Our enterprise cloud platform enables organizations to easily scale to support tens of thousands of virtual machines on a single system across multiple hypervisors and containers. Our solution helps our customers optimize infrastructure by significantly simplifying deployment and operations, which can lead to substantial reductions in capital expenditures and operating expenses.
>
> ***Our enterprise cloud platform is based on the Tintri CONNECT web services architecture, which has similar design characteristics as public cloud architecture***—using web services that are easy to assemble, integrate, tear down, reconfigure, and connect to other services. Our CONNECT architecture uses a building-block approach that is predicated on our REST APIs and virtual machine, or VM, and container level abstraction. Through a comprehensive set of proprietary software tool kits and plugins, we enable users to develop customized workflows and to automate their operations. Our CONNECT architecture is based on our virtualization-aware file system that allows an organization to view, manage and analyze application performance and quality of service, or QoS. CONNECT integrates with all major virtualization architectures, including those offered by VMware, Microsoft, Citrix, Red Hat and OpenStack, and can connect with public cloud service providers. Our platform addresses a large variety of use cases, including server virtualization, virtual desktop infrastructure, or VDI, disaster recovery and data protection, and development operations, or DevOps.
>
> * * *
>
> We have experienced significant revenue growth, with revenue increasing from $49.8 million in fiscal 2015 to $86.0 million in fiscal 2016 and to $125.1 million in fiscal 2017, representing year-over-year growth of 73% and 45%, respectively, for our two most recent fiscal years. Our revenue increased from $22.9 million in the three months ended April 30, 2016 to $30.4 million in the three months ended April 30, 2017, representing period-over-period growth of 33%. Our net loss was $69.7 million, $101.0 million and $105.8 million in fiscal 2015, 2016 and 2017, respectively, and $30.8 million and $30.7 million in the three months ended April 30, 2016 and 2017, respectively. Our accumulated deficit was approximately $376.0 million as of April 30, 2017.

175. The statement identified in Paragraph 174 above was materially false and misleading when made because it affirmatively misrepresented that: (1) Tintri's mission was to provide "an enterprise cloud platform[,]" when it had no such product in its portfolio, and indeed, had no product roadmap to offer such products in the future; (2) Tintri's product was an "enterprise cloud platform," when in fact, Tintri's products were virtualization storage products; (3) Tintri's products provided "cloud management software, web services, and a range of all-flash storage systems[,]" when in fact,

Tintri's products *only* provided storage, and to a very limited extent, software (but only software relating to storage); and (4) Tintri's "enterprise cloud platform"—which did not exist—was "based on the Tintri CONNECT web services architecture, which has similar design characteristics as public cloud architecture[,]" when in fact, CW-6 avers "Tintri CONNECT" is a "made-up word," and the Company's Application Programming Interfaces ("API") were only for storage.

176. The Registration Statement further explained Tintri's "enterprise cloud solution" as follows:

> ***Our highly differentiated and extensible enterprise cloud platform combines cloud management software and a range of all-flash storage systems***. Organizations use our platform as a foundation for their own private clouds—to build and run agile development environments for cloud-native applications and mission-critical enterprise applications. We enable users to guarantee the performance of their applications, automate common IT tasks to reduce operating expenses, troubleshoot across compute, storage and network, predict an organization's needs to scale, and provide needed elasticity on-demand. Our enterprise cloud platform enables organizations to easily scale to support tens of thousands of virtual machines on a single system across multiple hypervisors and containers, and to facilitate the migration to public cloud environments. Our solution helps our customers optimize infrastructure by dramatically simplifying deployment and operations, which can lead to significant reductions in capital expenditures and operating expenses.

(emphasis added).

177. The statement identified in Paragraph 176 above was materially false and misleading when made because it affirmatively misrepresented that Tintri's product offering was an "enterprise cloud platform," when in fact, Tintri's products were virtualization storage products.

178. In a discussion of the Company's competitive strengths, Tintri further boasted that:

> ***Our Solution Is Purpose-Built for Enterprise Cloud*** . . . ***Our platform, similar to public cloud environments***, operates as a set of services that allow our storage solution to integrate and communicate with other infrastructure elements, including public clouds, as building blocks. Our solutions' ability to monitor and manage at the individual VM and container level is central to our ability to deliver differentiated value to customers. Since 2008, we have spent over 400 person years to develop solutions purpose-built for enterprise cloud environments. We believe that our competitors would need to materially re-architect their products' hardware and software to provide similar functionality.

(emphasis added).

179. The statement identified in Paragraph 178 above was materially false and misleading

when made because it affirmatively misrepresented that Tintri's product offering was an "enterprise cloud," which was "similar to public cloud environments," when in fact, Tintri's products were virtualization storage products.

180. In a discussion of the Company's sales and marketing, the Registration Statement stated:

> *Marketing*. Our marketing is focused on building our brand reputation and market awareness, communicating product and service advantages, driving customer demand and generating leads for our sales force and channel partners. Our marketing team designs and implements a wide range of activities and initiatives, including social media, digital marketing, community events, partner co-marketing and integrated marketing campaigns. In addition, we manage "Tintricity Hub," an online community of customers that share best practices, trade ideas and provide referrals. Over 50% of our advocates are active in any given month. As of April 30, 2017, we had more than 1,200 Tintricity Hub members from approximately 650 companies.

181. The statement identified in Paragraph 180 above was materially false and misleading when made or failed to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading, because it failed to disclose that: (1) Tintri had implemented a new sales strategy that *required* its sales staff to falsely represent the Company's product offerings as Enterprise Cloud Solutions; and (2) there was significant pushback to this sales strategy, discontent within the sales department, and ultimately, sales team attrition and high employee turn-over.

## VII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

182. Defendants are liable for any false and misleading forward-looking statements issued in connection with the IPO. The safe harbor provision of § 27A of the Securities Act, 15 U.S.C. § 77z-2(b)(2)(D), specifically excludes those statements "made in connection with the initial public offering," which includes all of the false and misleading statements made in connection with the IPO. *See* Sec. VI, *supra*.

## VIII. PLAINTIFFS' CLASS ACTION ALLEGATIONS

183. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Tintri securities pursuant and/or traceable to Tintri's Registration Statement and Prospectus issued in connection with

the Company's June 30, 2017 IPO, seeking to pursue remedies under §§ 11 and 15 of the Securities Act (the "Class"). Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

184. Additionally, Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and b(3) on behalf of a sub-class consisting of all persons or entities that acquired Tintri common stock in the IPO on June 30, 2017 (the "Offering Subclass"), seeking to pursue remedies under §§ 12 and 15 of the Securities Act. Excluded from the Offering Subclass are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

185. The numbers of both the Class and the Offering Subclass are so numerous that joinder of all members is impracticable. Tintri offered 8,572,000 shares of common stock in the IPO and is actively traded on the NASDAQ. While the exact number of Class and Offering Subclass members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class and Offering Subclass. Record owners and other members of the Class may be identified from records maintained by Tintri or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

186. Plaintiffs will fairly and adequately protect the interests of the members of the Class and Offering Subclass and has retained counsel competent and experienced in class action and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class or Offering Subclass.

187. Common questions of law and fact exist as to all Class and Offering Subclass members and predominate over any questions solely affecting individual Class and Offering Subclass members. Among the questions of law and fact common to the Class and Offering Subclass are:

- whether the Registration Statement contained any material misrepresentations or omissions;

- whether the Individual Defendants have a viable "due diligence" defense to the strict liability imposed by Sections 11 and 12 of the Securities Act;
- whether Defendants can establish negative causation as a defense to or as a reduction of the strict liability otherwise imposed by Sections 11 and 12 of the Securities Act;
- whether the Individual Defendants are control persons of Tintri for purposes of Section 15 of the Securities Act;
- whether the federal securities laws were violated by Defendants' acts as alleged herein; and
- to what extent members of the Class and Offering Subclass have sustained damages and the proper measure of those damages.

188. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class and Offering Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for Class and Offering Subclass members to individually redress the wrongs done to them.

189. There will be no difficulty in the management of this action as a class action.

## IX. CAUSES OF ACTION

### <u>COUNT I</u>

### Violations of Section 11 of the Securities Act Against All Defendants

190. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

191. This claim is asserted by Plaintiffs against all Defendants on behalf of all persons who purchased or otherwise acquired Tintri securities pursuant and/or traceable to Tintri's Registration Statement and Prospectus issued in connection with the Company's June 30, 2017 IPO.

192. The Individual Defendants are strictly liable under the Securities Act as signatories of the Registration Statement for the misrepresentations and omissions contained therein, as identified in Paragraphs 155 to 181.

193. Tintri is strictly liable as the Issuer under the Securities Act for the misrepresentations and omissions it made in the Registration Statement, as identified in Paragraphs 155 to 181.

194. The Underwriter Defendants are liable for the misrepresentations and omissions made in the Registration Statement, as identified in Paragraphs 155 to 181, pursuant to Section 11(a)(5) of the Securities Act.

195. None of the Defendants named herein conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the Registration Statement and identified in Paragraphs 155 to 181 above were true, were without omissions of material fact or were otherwise not misleading.

196. By reason of the conduct alleged herein, each of the Defendants has violated Section 11 of the Securities Act.

197. Plaintiffs and the Class have sustained damages because the value of their Tintri common stock has declined. This decline is attributable by law to Defendants in the absence of proof that it was caused by other factors, which proof has not been established.

198. At the time of their purchases, Plaintiffs and the Class were without knowledge of the wrongful conduct alleged herein, and could not have reasonably discovered those facts more than one year prior to the filing of the initial complaint in this action. The initial complaint was filed within three years of the time that Tintri offered the shares covered by the Registration Statement to the investing public.

199. By virtue of the foregoing, Plaintiffs and the other Class members are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

## COUNT II

### Violation of Section 12 of the Securities Act Against All Defendants

200. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

201. This Count is brought pursuant to § 12(a)(2) of the Securities Act on behalf of a sub-class consisting of all persons or entities that acquired Tintri common stock in the IPO on June 30, 2017 (the "Offering Subclass"). Excluded from the Offering Subclass are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and

their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

202. By means of the Registration Statement, Defendants offered common stock of the Company to the Class in return for $7.00 each. Defendants' actions of solicitation consisted primarily of the preparation and/or dissemination of the Registration Statement.

203. Defendants sold Tintri common stock through the use of interstate communication, the use of interstate commerce, and the use of the mails, including the use of a Registration Statement, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading.

204. Defendants cannot prove that they did not know, or in the exercise of reasonable care, could not have known, of the untruth or omission described in the preceding paragraph.

205. By reason of the conduct alleged herein, Defendants violated § 12(a)(2) of the Securities Act. As a direct and proximate result of Defendants' conduct, Plaintiffs and other members of the Offering Subclass who purchased Tintri common stock in the IPO have suffered substantial damage. Accordingly, Plaintiffs and the other members of the Offering Subclass were harmed, and seek damages and/or rescission of the IPO.

## COUNT III

### Violations of Section 15 of the Securities Act Against the Individual Defendants

206. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

207. Klein, by virtue of his positions as CEO and Chairman of the Board, is a controlling person of Tintri within the meaning of Section 15 of the Securities Act.

208. Halifax, by virtue of his position as CFO, is a controlling person of Tintri within the meaning of Section 15 of the Securities Act.

209. Harty, by virtue of his position as CTO, is a controlling person of Tintri within the meaning of Section 15 of the Securities Act.

210. By virtue of the conduct alleged herein, Defendants Klein, Halifax, and Harty are liable as control persons for the primary violations of Sections 11 and 12 by Tintri, as alleged in Counts I

and II.

211. Klein, Halifax, and Harty did not conduct a reasonable investigation or possess a reasonable basis for the belief that the statements contained in the Registration Statement and identified in Paragraphs 155 to 181 above were true, were without omissions of material fact, and were not misleading.

212. Each of the Individual Defendants are liable to the Plaintiffs, the Class, and the Offering Subclass for damages suffered as a result of the primary Securities Act violations of Tintri.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

**A.** Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as class representatives for the Class and the Offering Subclass;

**B.** Requiring Defendants to pay damages sustained by Plaintiffs, the Class, and the Offering Subclass by reason of the acts and transactions alleged herein;

**C.** Awarding Plaintiffs and the other members of the Class and Offering Subclass prejudgment and post-judgment interest, as well as his reasonable attorneys' fees, expert fees and other costs; and

**D.** Awarding such other and further relief as this Court may deem just and proper.

## XI. DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED: February 2, 2018

GLANCY PRONGAY & MURRAY LLP

By: *s/ Alexa Mullarky*
Robert V. Prongay
Kara M. Wolke
Alexa Mullarky
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Lead Counsel for Lead Plaintiff Henrik Thørring and the Proposed Plaintiff Class*

COHEN MILSTEIN SELLERS & TOLL PLLC
Steven J. Toll
Times Wang
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

BRONSTEIN GEWIRTZ & GROSSMAN LLP
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296

*Additional Counsel for Lead Plaintiff Henrik Thørring and the Proposed Plaintiff Class*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On February 2, 2018, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 2, 2018, at Los Angeles, California.

*s/ Alexa Mullarky*
Alexa Mullarky

# Mailing Information for a Case 4:17-cv-05714-YGR Lance Tuller v. Tintri, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Benjamin Matthew Crosson**
  bcrosson@wsgr.com,fgarcia@wsgr.com,ddebold@wsgr.com
- **Caz Hashemi**
  CHASHEMI@WSGR.COM,dbellinger@wsgr.com,bcrosson@wsgr.com,fgarcia@wsgr.com,dgavril@wsgr.com,rlustan@wsgr.com,tbell@wsgr.com,cpurcell@wsgr.com,yannobil@wsgr.com
- **Alexa Jean Mullarky**
  amullarky@glancylaw.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,bmurray@glancylaw.com
- **Laurence M Rosen**
  lrosen@rosenlegal.com
- **Laurence M. Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net
- **Kara M Wolke**
  kwolke@glancylaw.com,SToll@cohenmilstein.com,EBerelovich@cohenmilstein.com
- **Shimon Yiftach**
  shimony@bgandg.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)